1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                       FOR THE DISTRICT OF OREGON

11   KRISTEN DREYER,                )
                                    )
12                   Plaintiff,     )
                                    )      No.  CV-05-418-HU
13        v.                        )
                                    )
14   COMMISSIONER OF SOCIAL         )
     SECURITY,                      )      FINDINGS & RECOMMENDATION
15                                  )
                     Defendant.     )
16   ───────────────────────────────)

17   Tim Wilborn
     WILBORN & ASSOCIATES, P.C.
18   2020-C SW 8th Avenue, PMB #294
     West Linn, Oregon 97068
19
         Attorney for Plaintiff
20
     Karin J. Immergut
21   UNITED STATES ATTORNEY
     District of Oregon
22   Neil J. Evans
     ASSISTANT UNITED STATES ATTORNEY
23   1000 S.W. Third Avenue, Suite 600
     Portland, Oregon 97204-2902
24
     Richard M. Rodriguez
25   SPECIAL ASSISTANT UNITED STATES ATTORNEY
     Office of the General Counsel
26   Social Security Administration
     701 5th Avenue, Suite 2900 M/S 901
27   Seattle, Washington 98104-7075

28       Attorneys for Defendant

     1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Kristen Dreyer brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction under 42 U.S.C. § 405(g). I recommend that the Commissioner's final decision be affirmed in part and reversed in part and remanded for additional proceedings.

PROCEDURAL BACKGROUND

Plaintiff applied for DIB on April 30, 2002, alleging an onset date of October 2, 2001. Tr. 55-57. His application was denied initially and on reconsideration. Tr. 25-39.

On August 14, 2003, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 259-291. On October 23, 2003, the ALJ found plaintiff not disabled. Tr. 13-23. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 5-8.

FACTUAL BACKGROUND

Plaintiff alleges disability based on a shattered left elbow. Tr. 92. He also suffers from lumbar disc disease. Tr. 18. At the time of the August 14, 2003 hearing, plaintiff was fifty-five years old. Tr. 264. He has a two-year degree from a community college. Id. His past relevant work is as a timber faller, baker, barber, and car salesman. Tr. 285.

I. Medical Evidence

Plaintiff's medical records begin with treatment in January 1997 with Dr. C. Thiessen, M.D., for back pain following an incident at work where he had to assist in carrying a 600 pound beam. Tr. 249. He sustained the injury on January 16, 1997, and

2 - FINDINGS & RECOMMENDATION

initially saw Dr. Thiessen on January 24, 1997.  Tr. 240, 249.

He complained of left hip pain, right foot tingling, and dragging his right leg.  Id.  Dr. Thiessen noted that plaintiff had undergone past microscopic back surgery in 1987.  Tr. 240.  On physical examination, he was in mild distress with an ataxic gait favoring one leg.  Id.  However, he seemed to be sitting and reading magazines in no apparent distress.  Id.  He complained of pain to central spinal pressure.  Id.

Dr. Thiessen found plaintiff's trunk range of motion to be flexion 80-90 degrees, extension neutral, lateral flexion to the left was 35 degrees, and to the right was 25 degrees.  His single leg raise was 70-80 degrees bilaterally.  Id.  Reflexes were equal to his knees and ankles.  Id.  Plaintiff had difficulty with a heel lift on the right leg.  Id.  Dr. Thiessen diagnosed plaintiff as having low back pain with radiculopathy.  Tr. 249.  He authorized plaintiff to be off of work from January 24, 1997, to February 4, 1997, and prescribed Flexeril and Predisone.  Id.

X-rays were taken and an MRI was performed.  Tr. 239, 242. The x-ray showed a deformity of the L4 vertebral body suggesting an old compression fracture, and degenerative disc disease at L5-S1 with slight retrolisthesis.  Tr. 242.  The MRI showed no significant interval change since a previous MRI in November 1995. Tr. 239.  It showed a mild compression fracture of the L4 and L5 vertebrae, and a postoperative laminectomy at L5-S1.  Id.  It also found moderately severe forminal stenosis at L5-S1, right greater than left, and minimal right paracentral disc herniation at L4-5 without any significant mass effect.  Id.

Dr. Thiessen saw plaintiff again on February 5, 1997.  Tr.
3 - FINDINGS & RECOMMENDATION

248, 245. Having seen the x-ray and MRI reports, his diagnosis was now spinal stenosis. Tr. 248. Dr. Thiessen prescribed Naprosyn and referred plaintiff to physical therapy. Id. He gave plaintiff a modified work release until February 19, 1997, and noted that plaintiff should change positions frequently from sitting to standing, with a weight limit of 20 pounds. Tr. 245, 248.

Dr. Thiessen noted at this visit that plaintiff complained of back pain increasing throughout the day from minimal in the morning to six out ten on a ten-point scale by the afternoon. Tr. 248. Plaintiff also complained of episodes of right hip pain and aggravation of pain with prolonged sitting, standing, and walking. Tr. 247.

On February 19, 1997, Dr. Thiessen reported that he was following plaintiff for back problems and was treating plaintiff mostly for spinal stenosis with a possible strain or sprain. Tr. 238. He remarked that plaintiff was going to physical therapy occasionally and doing exercises at home. Id. Plaintiff reported walking round trip to the post office, a mile from his home, several times per day, although it took him a long time. Id. He was taking Naprosyn and Flexeril occasionally, which was helping. Id.

On physical examination, plaintiff was in no apparent distress. He had no central spinal tenderness to fist percussion and no significant tense or tender paraspinal muscles to palpation. His trunk range of motion was 90 degrees flexion, although his extension was less than 15 degrees with stiffness. Id. He had lateral rotation of 40 degrees bilaterally and lateral flexion of 30 degrees bilaterally. Id.

4 - FINDINGS & RECOMMENDATION

A chart note by physical therapy dated February 21, 1997, notes that the home exercises were going well, although plaintiff reported that he was never completely pain free.  Tr. 243.

Although Dr. Thiessen indicated that plaintiff should see him again approximately four weeks following the February 19, 1997 visit, plaintiff never returned to Dr. Thiessen's clinic.  Tr. 236.

In November 1998, plaintiff suffered a serious injury to his elbow when he fell while working as a timber faller.  Tr. 187-204. He was seen in the emergency department of St. John Medical Center in Longview, Washington, and had surgery on the elbow that day. Id.  The surgery was performed by Dr. Bruce Blackstone, M.D.  Id.

In Dr. Blackstone's operative report dated November 30, 1998, his pre- and post-operative diagnoses were a comminuted[1] left distal humerus fracture.  Tr. 198.  Dr. Blackstone noted that upon opening the fracture site, plaintiff was noted to have a "terribly comminuted fracture."  Tr. 198.  Although "marked comminution" prevented an anatomic restoration of the distal humerus, Dr. Blackstone was ultimately able to restore some semblance of the normal joint surface with semi-rigid fixation.  Id. Dr. Blackstone noted that plaintiff's prognosis was somewhat guarded.  Tr. 200. He was at risk for post-traumatic arthrosis and stiffness of the elbow.  Id.  Dr. Blackstone stated that plaintiff would most certainly have some degree of post-traumatic arthrosis "as a result of this very severe intra-articular fracture."  Id.

Following surgery, Dr. Blackstone saw plaintiff on December

---

[1]  A fracture in which the bone is broken, splintered, or crushed into a number of pieces.

10, 1998, January 4, 1999, February 11, 1999, and March 25, 1999. Tr. 212-13. Beginning with the December 10, 1998 visit, plaintiff was encouraged to begin very gentle range of motion exercises. Tr. 213. Dr. Blackstone expressed concern regarding plaintiff's ability to ever return to work as a timber faller. Id.

On January 4, 1999, plaintiff reported not much in the way of elbow pain, but he was experiencing a significant flexion contracture, as Dr. Blackstone expected. Id. Dr. Blackstone encouraged plaintiff to work on this more vigorously. Plaintiff had well preserved pronation and supination, but lacked the last 20 degrees of supination. Id. He also had wrist stiffness and discomfort. Id. He could dorsiflex only about half the normal amount. Id. Dr. Blackstone noted that the x-rays now showed some minor settling at the articular surface, but overall, the structure of the humerus was maintained. Id. He explained that plaintiff's prognosis was still quite guarded. Id. He stated that plaintiff was guaranteed to have a certain degree of stiffness and arthrosis in the joint. Id. He cautioned plaintiff against any weightbearing on the left upper extremity. Id.

On February 11, 1999, plaintiff had flexion to 90 degrees, but not beyond. Tr. 212. He complained of difficulty getting his hand to his mouth. Id. He could extend to about 35 degrees and had full pronation and supination. Id. He was taking no pain medications. Id. He expressed some aching discomfort but no sense of crepitus[2]. Id. Dr. Blackstone encouraged plaintiff to now work

---

[2] A clinical sign in medicine characterized by a peculiar crackling, crinkly, or grating feeling or sound in the joints.

more aggressively on his range of motion.  Id.  He also referred him to physical therapy.  Id.

Plaintiff attended seventeen physical therapy sessions between February 11, 1999, and March 25, 1999.  Tr. 205-11.  The summary progress report notes that plaintiff was experiencing decreased pain and increased range of motion.  Tr. 205.  His range of motion for flexion of the left elbow was 120 degrees, extension was 45 degrees, pronation was 80 degrees, and supination was 75 degrees. Id.

Plaintiff last saw Dr. Blackstone on March 25, 1999.  Tr. 212. Dr. Blackstone reported that plaintiff was stabilized in regard to his motion.  Id.  He lacked 45 degrees of extension and could flex to about 120 degrees.  Id.  Plaintiff still had lots of aching and discomfort, but had full pronation and supination.  Id.  It was clear he could not return to work as a timber faller.  Id. Plaintiff told Dr. Blackstone he had no interest in vocational rehabilitation because he wanted to purchase a portable sawmill and try to do some work that way.  Id.

On January 20, 2000, Dr. Sharon Johnson, M.D., performed a residual functional capacity (RFC) assessment of plaintiff for Disability Determination Services (DDS).  Tr. 220-24.  Dr. Johnson assessed plaintiff as being capable of occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, standing and walking 6 hours in an 8-hour day, sitting 6 hours in an 8-hour day, occasionally crawling, frequently climbing ramps and stairs, never climbing ladders, ropes, and scaffolds, and frequently balancing, stooping, kneeling, and crouching.  Tr. 221. She noted that his ability to push and pull was limited in the

7 - FINDINGS & RECOMMENDATION

1  upper extremities.  Id.  She also noted that he had limited
2  reaching in all directions, including overhead.  Id.  However, she
3  found that he had no limits in handling, fingering, and feeling.
4  Id.

5       On September 8, 2000, orthopedic surgeon Dr. Frank Paudler,
6  M.D., examined plaintiff as part of a worker's compensation claim
7  related to plaintiff's elbow injury.  Tr. 250-56.  Dr. Paudler's
8  report refers to plaintiff's previous work as a timber faller and
9  notes that at the time of the examination, plaintiff was to
10 complete retraining as barber in the end of October 2000.  Tr. 252.

11      Dr. Paudler noted plaintiff's current report of symptoms as a
12 loss of motion, with a quite marked flexion contracture of the left
13 elbow.  Id.  Plaintiff complained of aching pain and stabbing pain
14 above the left elbow.  Id.  He explained that in certain positions,
15 his elbow pain was relatively constant at about 3 out of 10, but
16 occasionally, it went to a 10 in certain positions, lasting for a
17 few seconds, and plaintiff had to forcefully straighten out or move
18 his elbow to relieve the pain.  Id.

19      On physical examination, plaintiff's left elbow range of
20 motion showed extension to -52 degrees.  Tr. 254.  That is, Dr.
21 Paudler explained, plaintiff had a 52 degree flexion contracture of
22 the left elbow.  Id.  His flexion was to 125 degrees, his pronation
23 was 75 degrees, and his supination was 90 degrees.  Id.  Plaintiff
24 had palpable and audible grinding with active flexion and extension
25 in the left elbow.  Id.

26      Dr. Paudler assessed plaintiff has having a 21 percent
27 permanent partial impairment of his left upper extremity.  Tr. 256.
28 His objective findings for loss of motion, the flexion contracture

8 - FINDINGS & RECOMMENDATION

1    of 52 degrees with flexion to 125 degrees with moderate, constant
2    crepitation about the entire left elbow joint, amounted to the
3    equivalent of a 21 percent amputation value at the left shoulder.
4    Id.

5        On May 31, 2002, Dr. David Hasleton, M.D., examined plaintiff.
6    Tr. 214-19.  He noted that he had no records to review at the time.
7    Tr. 214.   Plaintiff reported experiencing chronic back pain for
8    over twenty years, with treatment at a pain clinic and taking
9    various pain medications not offering any help.   Id.   Plaintiff
10   further reported that he experienced constant pain, radiating down
11   both legs at the posterior aspects, and stopping at the knees.  Id.
12   His pain increased with sitting, decreased with standing.   Id.
13   Plaintiff estimated he could stand for 45 minutes at a time, and
14   sit for only 15-20 minutes at a time.  Id.   He could walk only
15   short distance of less than 1/4 mile.  Id.  Pain woke him up at
16   night and caused headaches.   Id.

17       Plaintiff told Dr. Hasleton that his wife did all the
18   household chores.   Tr. 215.   He described his typical day as
19   arising, eating breakfast, drinking coffee, puttering around his
20   garden, feeding his rabbits.  Id.  He stated that he used to hunt,
21   fish, do woodwork, sail, and ride motorcycles, but he gave up all
22   those hobbies because of his pain  Id.

23       On physical examination, Dr. Hasleton observed plaintiff walk
24   from the waiting room to the exam room.  Id.  Plaintiff's gait was
25   slow and he was hunched over a bit, but otherwise, he had a narrow-
26   based gait.  Id.  Plaintiff was able to sit comfortably on the
27   chair.  Id.  He was able to transfer from the chair to the exam
28   table, lie down, and get back up.  Id.  However, in order to get

9 - FINDINGS & RECOMMENDATION

1  up, he had to roll over to his left side and he was in some obvious
2  discomfort.  Id.

3      His range of motion for his back was lateral flexion of 10
4  degrees, flexion 50 degrees, and extension 5 degrees.  Tr. 216.
5  His range of motion was limited by pain.  Id.  Dr. Hasleton's
6  general findings were that there was no evidence of muscle atrophy,
7  asymmetry, or wasting in plaintiff's upper or lower extremities.
8  Tr. 217.  Plaintiff had some diminished strength in his left upper
9  extremity.  Id.  There was no crepitus, effusions, or erythema
10 overlying the joints.  Id.  Plaintiff's back was mildly tender to
11 palpation.  Id.  There was no paraspinous muscle asymmetry or
12 muscle spasms noted.  Id.  Plaintiff's pain was mostly over the
13 midline, but somewhat over the lumbosacral area laterally.  Id.
14 Plaintiff's passive leg raise revealed back pain with radicular
15 symptoms at approximately 30 degrees bilaterally.  Id.

16     Dr. Hasleton diagnosed plaintiff as having low back pain, out
17 of proportion to his exam, with no significant history of injuries,
18 and status post surgery, with no deep tendon reflexes to his lower
19 extremities appreciated.  Tr. 218.  He also found that plaintiff
20 had mildly decreased left arm strength, but no evidence of muscle
21 atrophy or asymmetry.  Id.

22     X-rays performed of plaintiff's lumbar spine on that date, May
23 31, 2002, showed moderate compression involving the superior aspect
24 of the L4 vertebral body, which did not appear to be acute.  Tr.
25 219.  Mild to moderate degenerative changes were present, primarily
26 at L3-4.  Id.  Additionally, there was a narrowing and bony
27 degenerative change involving the L5-S1 disc space posteriorly.
28 Id.  The conclusion was of a moderate compression of the L4

10 - FINDINGS & RECOMMENDATION

1  vertebral body and moderate lumbar degenerative changes.  Id.

2      On October 3, 2002, Dr. Martin Kehrli, M.D. assessed

3  plaintiff's RFC for the DDS.  Tr. 230-24.  In Dr. Kehrli's opinion,

4  plaintiff could occasionally lift or carry 20 pounds, frequently

5  lift or carry 10 pounds, stand or walk 6 out of 8 hours, sit 6 out

6  of 8 hours, frequently climb ramps or stairs, never climb ladders,

7  ropes, or scaffolds, frequently balance, and occasionally kneel,

8  crouch, and crawl.  Tr. 232.  Dr. Kehrli also concluded that

9  plaintiff had an unlimited ability to push and/or pull, and had no

10  manipulative limitations.  Id.

11      Dr. Richard Alley, M.D., reviewed Dr. Kehrli's assessment and

12  on November 20, 2002, affirmed it as written.  Tr. 234.  Then, Dr.

13  Alley rendered his own assessment of plaintiff's RFC on November

14  21, 2002.  Tr. 225-29.  Dr. Alley concluded that plaintiff could

15  occasionally lift or carry 20 pounds, could frequently lift or

16  carry 10 pounds, could stand or walk 6 out of 8 hours, could sit 6

17  out of 8 hours, could frequently climb ramps or stairs, could

18  occasionally climb ladders, ropes, or scaffolds, could frequently

19  balance, and could occasionally stoop, kneel, crouch, and crawl.

20  Tr. 226-27.  Dr. Alley also concluded that plaintiff was limited in

21  pushing and pulling with his upper extremities and had limited

22  reaching in all directions, including overhead.  Tr. 227.  Dr.

23  Alley concluded that plaintiff should avoid concentrated exposure

24  to extreme cold, wetness, humidity, and vibration.  Tr. 228.

25  II.  Plaintiff's Testimony

26      Plaintiff testified that he completed barber training in the

27  fall of 2000 and that he then opened a barbershop in Astoria for

28  ten months.  Tr. 266.  He worked four days per week, from 8:00 a.m.

11 - FINDINGS & RECOMMENDATION

1  to 5:00 p.m.. _Id._  He earned "[p]recious little." _Id._  In his

2  first month, he netted about $75 after paying the $325 rent.  _Id._

3      During the day, he was often able to sit or walk around as

4  necessary because he rarely had a day with back to back haircuts.

5  Tr. 267-68.  He could constantly move around.  Tr. 268.  But,

6  plaintiff testified, he nonetheless closed the shop because the

7  constant standing and constant holding his left arm up in the air,

8  caused "lots of knots and headaches" and produced pain in his

9  knees, his hips, and his back.  _Id._

10     Plaintiff also sold cars for three years and was a baker.  Tr.

11 269.  Plaintiff explained that from 1972 to 1987 he was a timber

12 faller until he ruptured a disc in 1987.  Tr. 270.  Plaintiff

13 explained that in his car sales job, he was working on hard

14 pavement all day and was not allowed to sit down unless he was with

15 a customer.  Tr. 278.  He stated that currently, he would not be

16 able to be on his feet that much.  Tr. 278-79.

17     In response to the ALJ's question about why he could not work

18 now, plaintiff testified that his back hurts "pretty bad" and he

19 has days where he has a hard time walking.  Tr. 271.  He also

20 stated that he has severe headaches.  _Id._

21     He explained that his back pain is in his low back and the

22 pain goes down both of his legs.  _Id._  He noted that he has been in

23 pain since 1978.  _Id._  He has no medical insurance because he

24 cannot afford it.  _Id._  Although he was on the Oregon Health Plan

25 at one point, he then got married and his wife made too much money

26 to qualify.  Tr. 272.  She has no health insurance either.  _Id._

27     In regard to his left arm, plaintiff stated that ever since he

28 shattered it, it has not been pain free.  _Id._  He stated that he is

12 - FINDINGS & RECOMMENDATION

not supposed to pick anything up with it. Tr. 273. He stated that Dr. Blackstone's advice was to use his left arm as a helping hand, not a working hand. Id. Plaintiff noted that sometimes his hand curls up and becomes useless. Id.

His pain level varies day to day, although the elbow always hurts. Id. It wakes him up at night. Id. His arm sometimes goes numb, sometimes produces a sharp pain, and sometimes produces a feeling like something is caught inside of it. Tr. 274. The real severe pain, however, does not last more than fifteen seconds because whatever feels like it has been grabbing, then releases. Id.

In regard to plaintiff's back pain, it also varies. Id. There are days when after he has gets up and has been sitting at the table with his morning coffee, he cannot then get up and move and hours will go by before he can get erect. Id. Sometimes a hot tub will help. Id. Plaintiff stated that he can move around for about thirty minutes before he has to sit down and that he cannot sit for long periods of time. Tr. 277. As he stated, "nothings [sic] comfortable for very long periods." Id.

Plaintiff also noted that he gets bad stress headaches four out of seven days per week. Tr. 275. He described them being so severe that he can hardly see. Tr. 276. He sleeps poorly as a result of the headaches. Id.

Plaintiff stated that on certain days, he takes a hot bath up to four times to relieve his pain. Tr. 281. He no longer drives far because it causes spasms in his legs, making him feel unsafe to drive. Id.

Plaintiff testified that in the three years prior to the

13 - FINDINGS & RECOMMENDATION

1  hearing, his physical pain had gotten worse, and in the previous

2  year, it had gotten a lot worse. Tr. 283. His back pain increased

3  so much he had to get rid of his rabbits because he could no longer

4  take care of them. Id.

5  III. Vocational Expert Testimony

6       Vocational Expert (VE) Patricia Ayerza testified at the

7  hearing. Tr. 284-90. She testified that plaintiff's prior work

8  was as a timber faller, barber, baker, and car salesman. Tr. 285.

9  The ALJ then posed the following hypothetical to the VE: a worker

10 fifty-two years old with the same educational and vocational

11 background as plaintiff who is limited to light levels of

12 exertional work and who can only occasionally engage in any

13 stooping, kneeling, crouching, or crawling. Tr. 286. The worker

14 should only occasionally engage in the use of any ropes, ladders,

15 or scaffolds, and can only occasionally use the left upper

16 extremity for any overhead purpose. Tr. 286. The worker is right

17 hand dominant and should not be exposed to any concentrated cold,

18 wet, humidity, or vibration. Id.

19      In response to this hypothetical, the VE testified that such

20 a person could perform plaintiff's past job as a car salesman. Id.

21 The ALJ then changed the hypothetical to include a sedentary

22 exertional level instead of a light exertional level. Tr. 287. In

23 response to that, the VE testified that plaintiff would have

24 transferrable skills from his car salesman job that would enable

25 him to do telemarketing. Id. She stated that telemarketing is

26 sedentary work. Id.

27      In response to the ALJ's inquiry of whether telemarketing had

28 a specific vocational preparation (SVP) of 3, the VE stated yes it

14 - FINDINGS & RECOMMENDATION

did.   Id.   The ALJ then stated that he was "used to hearing
telemarketing given as simple, routine, unskilled work even though
it's three it's the low end of semi-skilled[.]"  Tr. 287-88  The VE
responded that she personally did not believe that it was totally
unskilled work and that some vocational systems called SVP three
jobs entry level work, the low end of semi-skilled work.  Tr. 288.
She testified that there were 84,000 telemarketing jobs nationally
and 1,200 locally.  Id.

In response to questions from plaintiff's counsel, the VE
testified that in the telemarketing or car sales jobs, one to two
absences per month on a continuous basis would render the person
unemployable.  Tr. 288-89.

In a follow-up question, the ALJ asked the VE to explain the
frequency in the telemarketing job, of the use of the dominant hand
and arm and the non-dominant hand and arm.   Tr. 289.   The VE
explained that the dominant hand gets used more often.  Id.  The VE
added that the telemarketing job does not allow the worker to move
about outside of the work area, other than breaks.  Tr. 290.  The
car sales job requires "occasional use of the arms, non-dominant in
particular[,]" but more of the right dominant hand because it
requires writing up sales documents.  Id.

                        THE ALJ'S DECISION

The ALJ found that plaintiff had not engaged in substantial
gainful activity since October 1, 2001, his alleged onset date.
Tr. 17, 22. He next determined that plaintiff suffered from severe
impairments of lumbar disc disease and left upper extremity
fracture.   Tr. 18, 22.   However, the ALJ found that plaintiff's
impairments, either singly or in combination, did not meet or equal

15 - FINDINGS & RECOMMENDATION

1  a listed impairment.  Id.

2      Next, the ALJ determined plaintiff's RFC.  Tr. 18-21.  The ALJ

3  concluded that plaintiff retained the RFC for a limited range of

4  light exertion work, involving lifting no more than 20 pounds at a

5  time with frequent lifting or carrying of objects up to 10 pounds.

6  Tr. 18.   He  further  concluded  that  the  range  of  light  work

7  plaintiff  is  able  to  perform  is  narrowed  by  non-exertional

8  limitations.  Id.  He noted that based on plaintiff's elbow injury,

9  plaintiff has limited pushing and pulling abilities with the left

10  upper  extremity,  and  limited  abilities  for  reaching  in  all

11  directions, including overhead.  Id.  Due to his elbow injury and

12  his low back pain, the ALJ restricted plaintiff to occasionally

13  climbing  on  ladders,  ropes,  and  scaffolds,  and  occasionally

14  stooping, kneeling, crouching, and crawling.  Id.  Because of low

15  back  degenerative  changes  with  pain,  and  the  elbow  injury,

16  plaintiff should avoid concentrated exposure to cold, wetness,

17  humidity, and vibration.  Id.

18      With  this  RFC,  the  ALJ  determined,  based  on  the  VE's

19  testimony, that plaintiff could perform his past relevant work as

20  a car salesman.  Tr. 22.  Thus, the ALJ concluded that plaintiff

21  was not disabled.  Id.

22              STANDARD OF REVIEW & SEQUENTIAL EVALUATION

23      A claimant is disabled if unable to "engage in any substantial

24  gainful activity by reason of any medically determinable physical

25  or mental impairment which . . . has lasted or can be expected to

26  last for a continuous period of not less than 12 months[.]"  42

27  U.S.C. § 423(d)(1)(A).   Disability claims are evaluated according

28  to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395

16 - FINDINGS & RECOMMENDATION

(9th Cir. 1991).   The claimant bears the burden of proving disability.   Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989).   First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."   If so, the claimant is not disabled.   Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).   In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."   Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(c), 416.920(c).   If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."   Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d).   If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.   Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).   If the claimant can, he is not disabled.   If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work.   Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).   If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled.   20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits

17 - FINDINGS & RECOMMENDATION

1  only when the Commissioner's findings are based on legal error or
2  are not supported by substantial evidence in the record as a whole.
3  Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a
4  mere scintilla," but "less than a preponderance."  Id.  It means
5  such relevant evidence as a reasonable mind might accept as
6  adequate to support a conclusion.  Id.

7                                 DISCUSSION

8       Plaintiff raises several alleged errors committed by the ALJ:
9  (1) failing to find that his impairments equaled a listed
10  impairment; (2) rejecting plaintiff's testimony; (3) rejecting
11  written testimony provided by a lay witness; (4) failing to
12  properly evaluate a vocational report; (5) posing an incomplete
13  vocational hypothetical to the VE; (6) failing to ask the VE if her
14  testimony was inconsistent with the Dictionary of Occupational
15  Titles; and (7) applying an incorrect evidentiary standard to the
16  determination of plaintiff's RFC.

17  I.  Listed Impairment

18       At step three of the sequential analysis, the ALJ determines
19  whether the impairment meets or equals an impairment listed by the
20  Commissioner.  20 C.F.R. §§ 404.1520(d); 20 C.F.R. pt. 404, subpt.
21  P, App.  If the claimant is found to either meet or equal the
22  severity and durational requirements for the applicable listed
23  impairment, he is found presumptively disabled without
24  consideration of his age, education, and work experience.  Young v.
25  Sullivan, 911 F.2d 180, 183 (9th Cir. 1990).   An ALJ is
26  required to evaluate the relevant evidence before concluding that
27  a claimant's impairments do not meet or equal a listed impairment.
28  Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).  "A boilerplate

18 - FINDINGS & RECOMMENDATION

finding is insufficient to support a conclusion that a claimant's impairment does not do so." Id.

Although the ALJ is not required to explain why a claimant failed to satisfy every section of the listing, Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990), "[i]n the context of determining whether a combination of impairments establishes equivalence, . . . the ALJ must make sufficient findings." Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990). Thus, "in determining whether a claimant equals a listing under step three of the Secretary's disability evaluation process, the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments." Id.

In the instant case, the ALJ, after finding that plaintiff suffered severe impairments of lumbar disc disease and left upper extremity fracture, then determined that plaintiff's impairments did not meet or medically equal a listed impairment. Tr. 18. He explained:

> In reaching [this] conclusion, I have examined Section 1.00 of the Listing of Impairments, for the disorders of the musculoskeletal system. After fully examining the entire evidence, I find no treating or examining physician has reported findings similar in severity for any impairment of those listed in the above referenced sections of the Listing of Impairments. Therefore, based on the entire evidence, I find Mr. Dreyer's impairments, singly or in combination, do not meet or medically equal criteria in Appendix 1, Subpart P, Regulations Part 404.

Id.

Plaintiff argues that the ALJ's reasoning is insufficient and contrary to Ninth Circuit standards. Plaintiff further argues that the evidence in the record establishes that his combined limitations medically equal Listing 1.04A regarding disorders of

19 - FINDINGS & RECOMMENDATION

1  the spine.  See 20 C.F.R. § 404, Subpt. P, App. 1, Listing 1.04A.

2      I agree with plaintiff that the ALJ's discussion at step three
3  is inadequate.  The only basis articulated by the ALJ in support of
4  his step three determination is that he examined "the entire
5  evidence," and that based on the "entire evidence," plaintiff's
6  impairments, singly or in combination, did not meet or medically
7  equal a listed impairment.

8      Such reasoning does not demonstrate an evaluation of the
9  combined effect of plaintiff's impairments, much less an adequate
10  one.  It is akin to the boilerplate finding disapproved of in
11  Lewis.  Moreover, it is the type of general finding (such as citing
12  to the "record in general"), which is insufficient at other stages
13  of the sequential analysis and should not be sufficient here.  E.g.
14  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (general
15  findings are an insufficient basis to support an adverse
16  credibility determination).

17      I reject plaintiff's contention, however, that this Court is
18  the appropriate forum to make the step three medical equivalence
19  determination.  The ALJ evaluates the medical evidence and makes
20  the appropriate findings.  This Court, in reviewing the ALJ's
21  decision, is not a factfinder.  While this Court has discretion to
22  remand for further proceedings or award benefits, it is appropriate
23  to remand for benefits only when there are no outstanding issues
24  that must be resolved before a determination of disability can be
25  made, and it is clear from the record that the ALJ would be
26  required to find the claimant disabled were such evidence credited.
27  Moore v. Commissioner, 278 F.3d 920, 926 (9th Cir. 2002).  Although
28  the ALJ's rationale in support of his step three determination is

20 - FINDINGS & RECOMMENDATION

insufficient, proceeding to then make the step three determination here is inappropriate.  This outstanding issue must be resolved properly by the ALJ.

II.  Rejection of Plaintiff's Testimony

Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  When determining the credibility of a plaintiff's limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain when determining whether a claimant's complaints of pain are exaggerated.  <u>Id.</u>

The ALJ explained that in determining plaintiff's RFC, he "primarily considered [plaintiff's] own subjective allegations through his written statements of record as well as his testimony before me."  Tr. 18.  He also considered the written statements of plaintiff's friends.  <u>Id.</u>  He then stated that "I find the written statements of Mr. Dreyer and his friends do not provide reliable evidence to show that his ability to perform all types of work activity is compromised."  <u>Id.</u>

The ALJ stated:

21 - FINDINGS & RECOMMENDATION

> Based on the relevant Social Security Regulations and
> Rulings, in evaluating claimant's subjective allegations,
> I considered combined factors such as: daily activities;
> location, duration, frequency and intensity of pain;
> precipitating and aggravating factors; medication, type,
> dosage, effectiveness and side-effects; other treatment,
> measures [sic], and any other relevant factors. (Social
> Security Ruling 96-7p.)[.]    After reviewing all the
> pertinent information and examining the identified
> factors, I find the claimant is not entirely credible.

Tr. 19.

Following this, the ALJ then immediately began a discussion of

the objective medical evidence and the opinions of the state agency

non-examining physicians.    Tr. 19-21.    During his discussion of

this evidence and these opinions, he mentions two things unrelated

to the objective medical evidence and state agency physician

opinions, which could be relevant to the credibility determination.

First, he states that

> I noted that while he was receiving treatment for this
> [elbow] injury sustained in November 1998, Ms. [sic]
> Dreyer continued employment until at least some time in
> 2001, as evidenced by the report of his earnings (Exhibit
> C4D/11). In fact, notes covering the period prior to his
> alleged onset date of October 1, 2001, contain certain
> references to his training as a barber ending in October
> 2000 as well as general employment on modified duty
> (Exhibit C7F/68, C8F/53, 60).

Tr. 20.    Next, he states that

> [a]dditionally, the claimant has failed to produce
> medical reports covering the period since his alleged
> onset date of October 1, 2001 through the present, since
> the next reports of record consist of an examination made
> at the request of Disability Determination Services and
> other assessments by non-examining medical sources of
> record, also at the request of Disability Determination
> Services.

Id.

Plaintiff argues that the ALJ's reasoning in support of his

finding that plaintiff's testimony is not credible is insufficient

because the ALJ failed to explain why plaintiff is not entirely

22 - FINDINGS & RECOMMENDATION

credible and has merely made conclusory statements. Moreover, plaintiff argues, the ALJ simply recited the factors that are described in the regulations for evaluating symptoms, but made no analysis of them in the context of the facts presented by the evidence. Plaintiff contends that contrary to Social Security Regulation (SSR) 96-7p, the ALJ's decision does not contain specific reasons for the finding on credibility, supported by the evidence in the record, and they are not sufficiently specific to make clear to this Court the weight the ALJ gave to plaintiff's statements and the reasons for that weight.

While the ALJ in this case provides an adequately detailed discussion of the objective medical evidence, an ALJ may not base his credibility determination of plaintiff's statements regarding his limitations solely on a lack of objective evidence. Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005). The problem here is that the ALJ failed to adequately express his rejection of plaintiff's credibility for any reason other than the objective medical evidence.

As indicated above, and as plaintiff concedes, the ALJ properly recites all of the factors relevant to the ALJ's credibility determination. But, the ALJ discusses only one of those, the objective medical evidence, in any manner.

His other comments quoted above, made in the context of the discussion of the objective medical evidence and the state agency physicians' opinions, may be an attempt to discuss the relevant factors of plaintiff's daily activities and an unexplained absence

23 - FINDINGS & RECOMMENDATION

of medical treatment for excessive pain.  Presumably[3], the ALJ's reference to plaintiff's failure to produce medical records covering the period after his alleged October 1, 2001 onset date, was meant to suggest that plaintiff's pain testimony is unreliable because the level of pain described is inconsistent with a failure to seek medical treatment or pain relief.

As the cases make clear, the ALJ's rejection of pain testimony may be based on an unexplained absence of treatment.  Here, plaintiff carefully explained during the hearing that he lacked health insurance.  Tr. 271.  Although his wife works, she makes too much money for them to qualify for the Oregon Health Plan, but too little money for them to afford health insurance.  Tr. 271-72.

With this testimony, it was error for the ALJ to recite facts suggesting that he considered plaintiff's failure to seek treatment as a basis for finding plaintiff not credible.  See Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995) ("a disabled claimant cannot be denied benefits for failing to obtain medical treatment that would ameliorate his condition if he cannot afford that treatment."); Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (failure to seek medical care for back pain for more than three years "does not in any way prove that [claimant's] testimony concerning his pain at the time of his hearing was not credible."); cf. Smolen, 80 F.3d at 1284-85 (where claimant provides evidence of a good reason for not taking medication for his or her symptoms, the symptom testimony cannot be rejected for not doing so).

---

[3]  I state "presumably" because the ALJ fails to articulate why this evidence is relevant.

24 - FINDINGS & RECOMMENDATION

1    As for the ALJ's comments about plaintiff's continued

2  employment from November 1998 "until at least some time in 2001, as

3  evidenced by the report of his earnings (Exhibit C4D/11)" and his

4  "training as a barber ending in October 2000 as well as general

5  employment on modified duty (Exhibit C7F/68, C8F/53, 60)," I

6  presume[4] the ALJ's reason for making these statements is to suggest

7  that plaintiff's level of activity belies plaintiff's hearing

8  testimony regarding his level of pain.

9    First, the ALJ did not accurately construe the record.

10  Exhibit C4D/11 is an earnings record showing that, contrary to the

11  ALJ's statement, plaintiff earned no income in 1999 or 2000. Tr.

12  59. The statement also shows that he earned $1,964 in 2001, but,

13  as plaintiff explained, this was for his ten months of work as a

14  barber, which, as plaintiff testified, he could not continue to

15  perform because of the pain it caused to keep his left arm elevated

16  and to be on his feet. Tr. 268. Additionally, plaintiff testified

17  that he completed barber training in the fall of 2000 and that he

18  ran his barbershop for ten months. Tr. 266. His alleged onset

19  date is October 2001, after he stopped barbering. Thus, nothing in

20  this exhibit undermines plaintiff's credibility because it does not

21  show a level of activity inconsistent with his pain testimony.

22    Second, as to the ALJ's comment about plaintiff's "general

23  employment on modified duty," the records cited by the ALJ are Dr.

24  Thiessen's records from January and February 1997, when plaintiff

25  sought treatment for back pain after he assisted in lifting a 600

26

27

28    [4]  Again, I state this as a presumption because the ALJ
failed to articulate any significance to these comments himself.

25 - FINDINGS & RECOMMENDATION

pound beam.  Tr. 238, 245.  There, Dr. Thiessen allowed plaintiff a return to work on modified duty with the limitations that he frequently change positions from sit to stand and have a lifting limit of twenty pounds.  Id.  This record of modified work release in 1997 does not conflict with plaintiff's hearing testimony in 2003 regarding his pain limitations.

The ALJ discussed only the lack of objective medical evidence as support for his finding plaintiff not credible.  Assuming his unexplained comments about plaintiff's continuing some kind of work activity were intended to undermine plaintiff's testimony, such a conclusion is not supported by the record.  Assuming his unexplained comments about plaintiff's failure to seek medical treatment since October 1, 2001, were intended to undermine plaintiff's testimony, such a conclusion is not supported by the case law in the face of plaintiff's testimony that he lacks and cannot afford health insurance. As a result, the ALJ has failed to articulate any clear and convincing reason supported in the record, other than the lack of objective medical evidence, as a basis for rejecting plaintiff's testimony.  As noted above, lack of objective medical evidence alone is not an acceptable basis for this conclusion.[5]  Thus, the ALJ erred in rejecting plaintiff's testimony.

/ / /

---

[5]  Furthermore, I decline defendant's invitation to affirm the ALJ's determination regarding plaintiff's credibility for reasons not cited by the ALJ.  Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("[i]t was error for the district court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss.").

III.  Lay Witness Testimony

On November 19, 1999, plaintiff's friend Vernon Garrett, completed a questionnaire regarding plaintiff.   Tr. 110-18. Overall, Garrett's written responses indicate that plaintiff's activities were limited by pain.   Id.

On May 6, 2002, plaintiff's friend Kerrie Constance completed a questionnaire regarding plaintiff.  Tr. 155-66.  Her responses, like Garrett's, indicate that plaintiff's activities were limited by pain.  Id.

In his decision, the ALJ noted that he had reviewed the written statements provided by Garrett and Kerrie Constance.  Tr. 18.  He then explained that "the written statements of Mr. Dreyer and his friends do not provide reliable evidence to show that his ability to perform all types of work activity is compromised."  Id. Although the ALJ then provides further discussion regarding plaintiff, the ALJ makes no further mention of plaintiff's lay witnesses.

Lay witnesses are not competent to testify to medical diagnoses, but they are competent to testify as to a plaintiff's symptoms or how an impairment affects his or her ability to work. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  The ALJ may disregard a lay witness's testimony by offering reasons germane to the witness.  Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). If the ALJ notes "arguably germane reasons" for dismissing the law witness testimony, he is not required to "clearly link his determination to those reasons."  Lewis, 236 F.3d at 512.

Plaintiff argues that the ALJ's statement regarding plaintiff's lay witness testimony is mere boilerplate and does not

27 - FINDINGS & RECOMMENDATION

meet the required standard of discounting the witness's testimony for reasons germane to the witness.    In response, defendant contends that the ALJ's decision sets forth sufficient reasons and that moreover, the ALJ did not need to reject Garrett's testimony in any event because it "supported a level of functioning greater than that found by the ALJ." Deft's Opp. Brief at p. 12.

I recommend concluding that the ALJ did not err in rejecting plaintiff's lay witness testimony.    While the ALJ's poorly articulated rationale is perhaps less than desirable, as the <u>Lewis</u> court noted, even when the ALJ does not clearly link his determination to the required germane reasons, the ALJ's rejection of lay testimony is sufficiently supported if those germane reasons are noted in the ALJ's decision and supported in the record. <u>Lewis</u>, 236 F.3d at 512.

Here, following the conclusory statement of rejection, the ALJ immediately launched into a discussion regarding the objective medical evidence.    The ALJ noted, <u>inter</u> <u>alia</u>, examining physician Dr. Hasleton's May 31, 2002 report of plaintiff's limitations.    Tr. 20-21.    He also noted the reports and capacities evaluations of non-examining physicians.    Tr. 21.    While conflicts with such evidence cannot alone support the rejection of a claimant's subjective testimony, conflicts with medical evidence can provide the "germane reasons" to reject a lay witness's testimony.    <u>Lewis</u>, 236 F.3d at 511 ("an ALJ may discount lay testimony [if] it conflicts with medical evidence.").    Therefore, because a sufficient germane reason is noted in the ALJ's decision, the rejection of the lay testimony was not in error.

/ / /

28 - FINDINGS & RECOMMENDATION

IV.   Evaluation of Vocational Report

In October 1999, ACTION Vocational Resources, Inc., performed a vocational assessment of plaintiff as part of his worker's compensation claim resulting from his elbow injury in November 1998. Tr. 66-80. The assessment included a review of plaintiff's previous employment, including the skills and physical demands required for each of his previous jobs. Id. The report issued as a result of the assessment states that

> [g]iven Mr. Dreyer's extensive history of working as a Timber Faller, his inability to return to work in a bakery or sandwich shop due to his physical restrictions, his inability to return to truck driving or heavy equipment operation given his current physical restrictions, his failure to be considered gainfully employable as a Cost Estimator, and his religious preclusion from working as an Auto Salesperson on Saturdays, he is found to not have the transferable skills to be employable within his current physical restrictions and it is recommended he be provided with vocational services.

Tr. 66.

A physical capacities evaluation, perhaps done in conjunction with the ACTION vocational assessment, was performed on plaintiff by an occupational therapist at Progressive Rehabilitation Associates, on September 29, 1999. Tr. 81-86. In the summary section of the evaluation, the therapist wrote that plaintiff demonstrated significant limitations in lifting floor to waist, and waist to overhead, as well as in carrying and dynamic pulling. Tr. 81. These limitations were primarily due to plaintiff's report of increased pain in the posterior area of his left forearm and elbow joint. Id.

He also demonstrated limitations with dynamic push, unilateral carry, bending, squatting, ladder climbing, and stationary

1  standing, due to complaints of increased back pain. <u>Id.</u>  He met

2  none of the requirements of the job analyses since he did not

3  demonstrate lifting over 35 pounds and a stationary stand for up to

4  2 hours. <u>Id.</u>

5      In his decision, the ALJ stated that he

6      further reviewed the Ability to Work Assessment Report
       and Physical Capacities Evaluation made by Stephen C.
7      Washburn, a vocational rehabilitation counselor, on
       October 25, 1999 and September 29, 1999, respectively
8      (Exhibit C1E/1-23).  However, because these evaluations
       do not cover the period under consideration herein,
9      namely October 1, 2001 through the present, I am unable
       to rely on them for a proper adjudication of the present
10     claim.

11 Tr. 18.

12     Plaintiff argues that the ALJ's failure to consider the

13 vocational report and physical capacities evaluation from September

14 and October 1999 was in error.  He argues that the limitations

15 identified in these reports establish that he cannot perform his

16 past relevant work and additionally establish objective limitations

17 in plaintiff's ability to use his arms and hands which the ALJ did

18 not consider.  Plaintiff argues that the fact that the reports were

19 dated in 1999 does not "vitiate their applicability to the relevant

20 time period." Pltf's Op. Brief at p. 18.  According to plaintiff,

21 "[t]hese reports formed the basis of Plaintiff's projected residual

22 functional capacity which guided his vocational rehabilitation as

23 a barber - an occupation which he, ultimately, was unable to

24 perform as substantial gainful activity and which he, ultimately,

25 had to stop because of his impairments." <u>Id.</u>  According to

26 plaintiff, "such vocational evidence is relevant to the time period

27 at issue." <u>Id.</u>

28     I reject plaintiff's argument.  As defendant notes, under the

30 - FINDINGS & RECOMMENDATION

1  relevant regulations, acceptable medical sources include licensed

2  physicians and licensed psychologist, but not physical therapists,

3  vocational counselors, or chiropractors. 20 C.F.R. § 404.1513.  An

4  occupational therapist or vocational counselor is an "other source"

5  under section 404.1513(d).

6      Under Ninth Circuit precedent, testimony from "other source"

7  professionals is evaluated under the standard for other lay

8  witnesses.  Dodrill, 12 F.3d at 919.  As described above, in

9  disregarding such testimony, the ALJ must articulate reasons

10 germane to the witness.  Id.  Here, the ALJ's reasoning is

11 sufficient.  The fact that the assessments were of a time period

12 two years before plaintiff's alleged onset date is a reason germane

13 to the reports which is supported in the record.[6]

14 V.  Standard of Proof

15     As both parties acknowledge, the appropriate standard of proof

16 an ALJ should apply in determining whether plaintiff is disabled is

17 a preponderance of the evidence.  E.g., Jones v. Chater, 101 F.3d

18 509, 512 (7th Cir. 1996) (noting that although Social Security Act

19 _____

20     [6]  Moreover, the single case cited by plaintiff in support

21 of his argument that the ALJ's failure to consider the vocational
   assessment was error, is not on point.  In Flores v. Shalala, 49

22 F.3d 562 (9th Cir. 1995), the court addressed an issue related to
   plaintiff's request for attorney's fees.  As part of the

23 discussion of the attorney's fee issue, the court reviewed the
   history of the case, including that at the first of two times the

24 case was before the district court, the district court determined
   that the ALJ had improperly disregarded a vocational evaluation

25 report.  Id. at 564.  The case contains no discussion of why the
   district court found that the ALJ had erred in regard to that

26 issue.  It has no independent discussion by the Ninth Circuit on
   the issue.  The case does not provide any guidance for the

27 standards an ALJ may properly use in crediting or rejecting an

28 vocational assessment.

31 - FINDINGS & RECOMMENDATION

and its regulations do not prescribe a standard of proof, "we have no doubt that preponderance of the evidence is the proper standard, as it is the default standard in civil and administrative proceedings[.]"); Deft's Brief at p. 5 ("The Commissioner does not dispute that the standard of proof in ordinary civil proceedings is the preponderance of the evidence.").

Here, the ALJ spent several pages reviewing the medical evidence in assessing plaintiff's RFC.   Tr. 18-21.   At the conclusion of this review, the ALJ stated:

> In sum, after reviewing the entire evidence and examining all the relevant factors, I conclude the substantial evidence of record reasonably supports my findings for the described residual functional capacity. "Substantial evidence" is relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion. Social Security Ruling 96-2p (07/02/96).

Tr. 21.

Plaintiff argues that the ALJ erred as a matter of law by using a "substantial evidence" standard instead of the "preponderance of the evidence" standard when weighing the evidence and making his findings of fact regarding plaintiff's RFC. Plaintiff contends that by stating that there was "substantial evidence" to support his RFC finding, the ALJ confused the appropriate standard used to weigh the evidence with the standard typically used by a reviewing court deferring to agency findings of fact if supported by substantial evidence.

In response, defendant argues that the ALJ need not recite "magic words" and expressly state that he found, by a preponderance of the evidence, that plaintiff has not established disability. Defendant further contends that this Court should infer that the

ALJ considered the entire record and weighed it appropriately.

The ALJ's decision is unclear. If the ALJ had made no mention of any particular standard, it would be reasonable to presume that the ALJ had appropriately used a preponderance standard by which to evaluate and weigh the evidence and make a finding regarding plaintiff's RFC. It is the ALJ's express reference to a "substantial evidence" standard that injects doubt into the decision.

As the District of Columbia Circuit noted in a similar situation,

> on judicial review of agency action, administrative findings of fact must be sustained when supported by substantial evidence on the record as considered as a whole. . . . But that rule implicates only the reviewing court; the yardstick by which the agency itself is to initially ascertain the facts is something else again.

Charlton v. FTC, 543 F.2d 903, 907 (D.C. Cir. 1976) (noting that when the factfinder agency itself adopted a substantial evidence "formulation as the criterion by which Charlton's conduct was to be gauged, the Commission hopelessly confused two legal canons designed to serve entirely distinct purposes.") (footnote omitted).

In light of the ALJ's express reference to a "substantial evidence" standard, I cannot reasonably infer that he weighed the evidence under a preponderance standard. To the extent the ALJ might have relied on something other than a preponderance of evidence standard, he erred. The ALJ should clarify the basis of his decision in this regard upon remand.

VI.  Incomplete Hypothetical

If the ALJ's hypothetical to the VE fails to include all of the plaintiff's limitations, it is of no evidentiary value. E.g.,

33 - FINDINGS & RECOMMENDATION

1  Edlund v. Massanari, 253 F.3d 1152, 1160 (9th Cir. 2001).

2  Plaintiff argues that ALJ's vocational hypothetical did not

3  accurately reflect all of plaintiff's limitations. Specifically,

4  plaintiff notes that although the ALJ himself found that plaintiff

5  has limited pushing and pulling abilities with his left upper

6  extremity and limited abilities for reaching in all directions,

7  including overhead, Tr. 18, the ALJ asked the VE to consider only

8  that plaintiff could "occasionally use the left upper extremity for

9  any overhead purpose." Tr. 286. The ALJ omitted any reference to

10 plaintiff's limited pushing and pulling abilities. The ALJ also

11 failed to include plaintiff's limitation in reaching in all

12 directions.

13    In response, defendant states that the ALJ's RFC finding

14 included all work-related limitations demonstrated by reliable

15 evidence and that the hypothetical question given to the VE was

16 based upon substantial evidence. Defendant contends that the

17 "ALJ's RFC and hypothetical were supported by the most recent

18 medical evidence and were, therefore[,] improper." Deft's Opp.

19 Brief at p. 15.

20    Defendant misses the point. The argument here is not whether

21 the RFC was correct. Rather, even accepting the ALJ's RFC as

22 accurate, the ALJ still omitted limitations present in his own RFC

23 from the hypothetical given to the VE. Moreover, even accepting

24 defendant's argument that the ALJ may not have been required to

25 call a VE in this case, the ALJ expressly relied on the VE's

26 testimony in determining that plaintiff can return to past relevant

27 work. Tr. 22. Because the hypothetical was incomplete, the VE's

28 testimony has no evidentiary value. Because the ALJ relied on the

34 - FINDINGS & RECOMMENDATION

1  VE's testimony in his step four conclusion, it is invalid and the

2  case should go back to the ALJ for a proper VE question(s).

3  VII.  VE's Testimony

4       Although the ALJ did not include all of plaintiff's

5  limitations in his hypothetical to the VE, he did ask the VE about

6  the frequency of use of the non-dominant hand in the telemarketing

7  and car sales jobs.  Tr. 289-90.  In response, the VE testified

8  that the telemarketing position required use of the dominant hand

9  "more often" and that the car sales job required only "occasional

10 use of the arms, non-dominant in particular."  Id.

11      Plaintiff notes that the Dictionary of Occupational Titles

12 (DOT), provides that the job of car salesman, DOT #273.353-010,

13 requires frequent reaching.  As such, plaintiff notes, the VE's

14 testimony that the job requires only occasional use of the arms,

15 conflicts with the DOT.

16      The DOT raises a presumption as to a particular job's

17 classification.  Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir.

18 1995).  The presumption is rebuttable if "the record contains

19 persuasive evidence to support the deviation."  Id.  ("an ALJ may

20 rely on expert testimony which contradicts the DOT, but only

21 insofar as the record contains persuasive evidence to support the

22 deviation").

23      The ALJ did not ask the VE to explain why her testimony about

24 occasional use of arms in a car sales job deviated from the DOT's

25 classification of the job as requiring frequent reaching.  In light

26 of Johnson, the ALJ erred in this regard.  See also Soc. Sec. R.

27 (SSR) 00-4p, found at 2000 WL 1898704, at *4 ("When a VE . . .

28 provides evidence about the requirements of a job or occupation,

35 - FINDINGS & RECOMMENDATION

1  the adjudicator has an affirmative responsibility to ask about any
2  possible conflict between that VE . . . evidence and information
3  provided in the DOT . . . . If the VE's . . . evidence appears to
4  conflict with the DOT, the adjudicator will obtain a reasonable
5  explanation for the apparent conflict.").

6  VIII.  Remand

7       In light of the errors made by the ALJ, the case must be
8  remanded.  Plaintiff argues that the remand should be for a
9  determination of benefits.  Defendant contends that a remand for
10 additional proceedings is appropriate.

11      For the reasons articulated above, I find that remanding to
12 the ALJ for a determination at step three is appropriate.
13 Plaintiff contends that the record conclusively establishes that he
14 cannot perform his past relevant work or any other work in the
15 national economy and thus, the record at steps four and five is
16 fully developed.  If so, this would obviate the need to remand for
17 a determination at step three.  I disagree with plaintiff.

18      The court has discretion to reverse the Commissioner's final
19 decision with or without a remand for further administrative
20 proceedings.  Harman v. Apfel, 211 F.3d 1172, 1177 (9th Cir. 2000).
21 When an ALJ improperly rejects evidence, the court should credit
22 such evidence and remand for an award of benefits when:  "'(1) the
23 ALJ failed to provide legally sufficient reasons for rejecting such
24 evidence, (2) there are no outstanding issues that must be resolved
25 before a determination of disability can be made, and (3) it is
26 clear from the record that the ALJ would be required to find the
27 claimant disabled were such evidence credited.'"  Moore, 278 F.3d
28 at 926 (quoting Smolen, 80 F.3d at 1292).

36 - FINDINGS & RECOMMENDATION

Moreover, "if the Smolen test is satisfied with respect to the [improperly rejected medical evidence], then remand for determination and payment of benefits is warranted regardless of whether the ALJ *might* have articulated a justification for rejecting [the medical] opinion." Harman, 211 F.3d at 1179.

This Court is aware of Ninth Circuit cases recognizing that the "crediting as true" rule is not mandatory. Connett, 340 F.3d at 876. Thus, when a court finds that the ALJ improperly rejected the subjective symptom testimony of a claimant, it has some flexibility and is not required to credit the testimony as a matter of law and direct an award of benefits. Id.

Here, while the ALJ improperly rejected plaintiff's testimony by articulating a conflict with objective medical evidence as the only legitimate basis for discrediting plaintiff, every other error by the ALJ as discussed here requires additional proceedings before a determination of disability or non-disability may be made. Thus, in this case, I exercise my discretion in favor of remanding for additional proceedings.

                              CONCLUSION

The Commissioner's decision should be affirmed in part and reversed in part and this case should be remanded for additional proceedings.

                          SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due June 7, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due

37 - FINDINGS & RECOMMENDATION

1  June 21, 2006, and the review of the Findings and Recommendation

2  will go under advisement on that date.

3      IT IS SO ORDERED.

4              Dated this __23rd___ day of ___May_____, 2006.

5

6

7                          ___/s/ Dennis James Hubel_____
                           Dennis James Hubel
8                          United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38 - FINDINGS & RECOMMENDATION